GRAHAM & ZENGER, INC. v. UNITED STATES

No. 5643.—Invoice dated Boussu, Belgium, September 7, 1935.
Entered at New York, N. Y., September 28, 1935.
Entry No. 735463.

(Decided May 26, 1942)

*Daniel P. McDonald (Siegel & Mandell, associate counsel) for the plaintiff.*
*Paul P. Rao, Assistant Attorney General (Daniel I. Auster, special attorney), for the defendant.*

OLIVER, Presiding Judge: This is an appeal to reappraisement under section 501 of the Tariff Act of 1930 from the value found by the United States appraiser at the port of New York on certain glassware exported from Belgium.

The merchandise was appraised on the basis of foreign value, and it is claimed by plaintiff that the proper basis for appraisement is export value. Plaintiff's contention is based primarily upon the theory that

the foreign market for glassware such as or similar to that in question was a controlled market at the time of exportation of the instant merchandise. The glassware in question was imported prior to the enactment of the Customs Administrative Act of 1938. Therefore, in determining whether a foreign value existed for the present merchandise consideration must be given to sales and offers for sale in the principal markets of Belgium whether for home consumption or for export to countries other than the United States. *United States* v. *Livingston & Southard, Inc.* (23 C. C. P. A. 214, T. D. 48060).

The evidence before me consists of the oral testimony of two witnesses who appeared on behalf of the plaintiff, and two special agents' reports that were offered by defendant and admitted in evidence as defendant's exhibits 1 and 2.

It appears from this record that on April 11, 1935, there was formed in Belgium an association known as Groupement des Gobeleteries Belges made up of all the glass manufacturers in that country, and that on August 11 of the same year this association was placed under direct supervision of the Belgian Government by Governmental decree issued as of that date. The purpose of the association was to stabilize the glassware industry in Belgium which, at that time was operating in a highly fluctuating market due to devaluation of the Belgian franc.

Membership in the association was compulsory for all manufacturers of glassware in Belgium. The association established minimum prices at which the manufacturers were to sell their products to the different markets. Separate price lists were issued governing the merchandise sold in the foreign market for home consumption, and for each of the countries to which glassware was exported. All manufacturers were compelled to use the prices fixed in the price lists as a minimum. Failure to do so resulted in the imposition of severe penalties. The manufacturers in all cases were held responsible for compliance with the requirements of the association.

When an order was placed the purchaser was required to state whether the merchandise was intended for home consumption or for export, and if it was to be exported the name of the country had to be disclosed. On receipt of an export order, the manufacturer would make application to the association for an export license which was prepared in duplicate, the original being sent to the manufacturer and the copy forwarded to the Minister of Economic Affairs at Brussels. The original export license accompanied the shipment to the port of exportation where it was taken up by the Belgian customs officials and transmitted to the Ministry to be checked with the carbon copy. When merchandise was sold for home consumption, it was on condition that it could not be exported. Any violation of

this condition resulted in the imposition of a penalty on the manufacturer in the sum of ten times the amount of the fraud.

On November 1, 1936, approximately a year after the date of exportation of the merchandise in question, the practice was instituted of having all invoices covering merchandise sold for home consumption bear the following notation:

This merchandise is sold for exclusive use in the Belgian home market and cannot be exported.

It is argued by counsel for defendant that since this practice did not become effective until long after the date of exportation of the glassware in question, it cannot be said that such restriction applied to the present merchandise and the market therefor. However, it is clear from the record that this notation on the invoices of merchandise sold for home consumption did not introduce any new procedure with respect to such transactions. Both the oral testimony of plaintiff's witness, Simon, and the special agent's report, exhibit 1, agree that it had been generally recognized throughout the trade since this association of manufacturers was formed, that merchandise sold for home consumption could not be exported. On this point, the report referred to states that,

the manufacturers interviewed agreed that such a stamp was superficial and entirely unnecessary since the requirement of an export license already completely prohibited any merchandise to be resold for exportation which was sold for home consumption.

With respect to sales of glassware for home consumption, the dealer who purchased from the manufacturer was free to resell the merchandise at whatever price he chose and was not restricted in its use in the home market but his right to resell it was limited to the home market. Sales to countries other than the United States were also subject to the minimum prices approved by the association for the country stated at the time of placing the order as being the destination of the merchandise, and the goods could be shipped only to that country which was indicated on the export license.

Based on the facts as hereinabove set forth, plaintiff contends that the foreign market for this glassware was a controlled market and therefore cannot form the basis for appraisement of the instant merchandise. The question of a controlled or restricted foreign market has been the subject of much customs litigation, and our appellate court has consistently held that where the control over the sale of merchandise in the foreign market extended to its resale and disposition or use, that conditions were created which precluded the finding of foreign value as the proper basis for appraisement. *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158; *J. H. Cottman* v. *United States*, 20 C. C. P. A. 344, T. D. 46114;

*United States* v. *Half Moon Manufacturing & Trading Co., Inc.,* 28 C. C. P. A. 1, C. A. D. 115; *United States* v. *Paul J. Pauls,* 28 C. C. P. A. 7, C. A. D. 116. It seems unnecessary to review in detail the cited cases. Suffice to say that in these cases the court held that the foreign market was a controlled market upon a showing that the restrictions imposed attached either to the resale and the free use or dominion over the merchandise, or that sales were confined to selected purchasers.

In the present case, it is fairly established by the record that the restriction on the use of glassware sold for home consumption prevailed through its ultimate disposition. The merchandise was not freely offered for sale. It was offered conditionally, that condition being the limitation of use in the home market. It is true that the resale price was not restricted, but the merchandise sold for home consumption always carried the condition that it must be used in that market. Under the cited authorities, this restriction upon the buyer's control over the product created a controlled market.

In the *Cottman* case, *supra*, the facts before the court were somewhat analogous to those presented herein. There, the merchandise consisted of certain raw phosphate rock exported from Morocco. An agency of the government of the French protectorate in Morocco had control over all transactions dealing with that merchandise. This control was exercised over the exportations to other countries, as well as in the home market. In Morocco, the home market, it was sold to farmers and superphosphate works. The farmers had to use it for their own personal uses and could not resell or export it. The superphosphate works had to use it for making superphosphate and could not sell or export it. When this raw phosphate rock was exported, it was also sold subject to restriction on its use in the country of exportation. The Court of Customs and Patent Appeals held that the restriction which applied to use only created a controlled market, and in reaching that conclusion said, "we are unable to see any real distinction, in principle, between a market controlled as to price and one controlled as to the use of the merchandise."

So far as sales for exportation to countries other than the United States are concerned, the control relates to minimum prices alone. The association's fixing of minimum prices on sales in the home market also applied on sales for exportation to countries other than the United States, and such sales were not restricted to any particular class or classes of buyers. Furthermore, no control was exercised over the disposition of the merchandise by such purchasers in such export markets.

The conditions on sales for export to countries other than the United States, however, do not affect the conclusion herein that the foreign market was a controlled one. The effect of the control over the use

of merchandise sold for home consumption cannot be removed by the fact that such restriction was not carried to countries to which it was exported. A condition analogous to that presented herein was found to exist in the case of *United States* v. *Half Moon Manufacturing & Trading Co.*, *Inc.* (28 C. C. P. A. 1, C. A. D. 115). That case involved certain bottle caps manufactured in Holland. The merchandise was sold in the home market with the express restriction upon the purchaser that he could not resell it at prices other than those dictated by the seller, and that he could not export the bottle caps until after they had been fitted to bottles. Sales for export to countries other than the United States, however, were made with no restrictions, whatever. Under that set of facts, the court found that the merchandise was not freely offered for sale to all purchasers in the foreign market, and accordingly held that no foreign value existed for such merchandise.

It is argued by counsel for defendant that to hold in the present case that the foreign market was a controlled market would vitiate section 402 (c) of the Tariff Act of 1930, which section defines "foreign value" for the purposes of appraising imported merchandise. A similar contention was made in the *Half Moon Manufacturing & Trading Co.*, *Inc.*, case, *supra*, and in answering it our appellate court said:

As to this we can only say that Congress has defined for the courts what foreign value means, it not being left to the courts themselves to define it. The definition is one of long standing, its substance reaching back almost, if not quite, to the beginning of customs administration in this country. It may have been instituted at a time when business methods were entirely different from those which are practiced in foreign countries, and, to an extent, in our own, at the present time; but however that may be, the courts are not at liberty to set aside the definition which Congress has given and substitute one of their own making. Again and again the statute has been construed to mean that in a market restricted, as was the market for this merchandise in Holland, foreign value cannot be found on the basis of inland sales.

Following the principles enunciated in the cited authorities, I hold that for the purpose of appraisement of the instant merchandise there was no foreign value therefor as contemplated by section 402 (c) of the Tariff Act of 1930.

The minimum prices on sales for exportation to the United States were fixed by the association in the same manner and to the same extent as were the prices on sales for exportation to countries other than the United States. No restriction was placed on the purchaser to whom the merchandise could be sold, nor was any control exercised over the use or disposition of the merchandise in this country. The export market to the United States was a free and open one subject only to the minimum prices fixed for this market by the manufacturers' association.

In the case of *United States* v. *Michele Diagonale* (22 C. C. P. A. 517, T. D. 47497) the Court of Customs and Patent Appeals held that a restriction on minimum prices alone does not create a controlled market. There, the merchandise consisted of certain silver filigree that was freely offered to all purchasers in Italy at prices fixed by an association composed of the dealers in such merchandise in the foreign market. The court held that such conditions did not constitute a controlled market and in reaching its conclusion stated

that the mere fact that an association fixes the price at which its members shall sell merchandise, without any restrictions upon the purchasers thereof, does not constitute a controlled or restricted sale in the sense that such price may not be considered in determining the foreign value of merchandise.

While the court, in the *Diagonale* case, *supra*, had before it the question of a controlled foreign market, the reasoning applied therein is equally applicable here in determining whether or not there was a statutory export value for the instant merchandise. The circumstances existing in the Italian market upon which the decision in the *Diagonale* case, *supra*, was based were comparable with those prevailing in the Belgian market at the time of exportation of the merchandise at bar. Following the principle enunciated in that case, I hold that export value, as such value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for appraisement of the glassware in question.

Having determined there exists no foreign value for the merchandise in question, and that the proper basis for appraisement thereof is export value, the next question presented is whether the plaintiff has proved an export value for this glassware.

The president of the plaintiff corporation testified that he has been dealing with the foreign manufacturer and shipper of the glassware in question for 30 years; that he purchased the merchandise in question at the prices shown on the invoice; that in buying these goods he acted under no special agreement with and received no special discounts from the foreign shipper; and that the relationship between his concern and the foreign manufacturer was that of buyer and seller. The witness further testified that at different times he had purchased in the Belgian market from approximately twenty glassware manufacturers merchandise similar to that under consideration; and that, during 1935, when the instant merchandise was imported, he was familiar with their prices of such glassware. He stated that the prices paid for the instant merchandise were substantially the same as those quoted for this kind of glassware by other manufacturers in the same market at the same time.

The special agent's report, exhibit 2, refers to the relationship between the plaintiff herein and the manufacturer of the present merchandise as follows:

The importer is an outright purchaser and has no exclusive rights of sale for the United States and the manufacturer is free to sell to any purchaser in the United States the identical and/or similar merchandise.

The testimony adduced by the plaintiff is uncontradicted and, in my judgment, is sufficient to warrant a finding that the dutiable export values of the glassware in question are the entered values.

On the basis of the record before me, I find as a matter of fact:

(1) That the merchandise in question consists of certain glassware exported from Belgium.

(2) That the foreign market, at the time of exportation of the instant merchandise, for such or similar merchandise, was a controlled market.

(3) That there was no foreign-market value, as such value is defined in section 402 (c) of the Tariff Act of 1930, for the instant merchandise at the time of exportation thereof.

(4) That the proper basis of appraisement for said merchandise is export value, as such value is defined in section 402 (d) of the said act.

(5) That such dutiable export values of the glassware in question are the entered values.

Accordingly, I hold as matter of law that the correct dutiable values of this glassware are the export values as set forth in fact (5). Judgment will be rendered accordingly.